UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                  Case No. 22-cr- 045

YUE LIU, a/k/a "TROY LIU,"

        Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, Richard G. Frohling, United States Attorney for the Eastern District of Wisconsin, and John P. Scully, Assistant United States Attorney, and the defendant, Yue Liu, also known as Troy Liu, individually and by attorney Peter Zeidenberg, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in a two-count information, which alleges violations of Title 18, United States Code, Sections 1343 and 1957.

3.     The defendant has read and fully understands the charges contained in the information. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to waive prosecution by indictment in open court.

5. The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

**THE UNITED STATES ATTORNEY CHARGES THAT:**

<u>**Allegations Common to All Counts**</u>

1. *At all times material to this information:*

    a. *Yue Lie, also known as "Troy Liu," resided in the Eastern District of Wisconsin and was employed as an engineering professor at the University of Wisconsin, Milwaukee ("UWM").*

    b. *Liu created a business entity in the State of Wisconsin. In April 2016, he changed the entity's name to the UW International Education Foundation LLC ("UWIEF"). In November 2017, he changed the name of that entity again to the Wisconsin International Education LLC ("WIE").*

    c. *Liu established and controlled a BMO Harris bank account ending in x3169 in the name of UWIEF, and a US Bank account ending in x6573 in the name of WIE.*

<u>**COUNT ONE**</u>
*(Wire Fraud)*

2. *Beginning in approximately April 2016, and continuing through at least November 2020, in the State and Eastern District of Wisconsin and elsewhere,*

**YUE LIU, a/k/a "TROY LIU,"**

*with intent to defraud, knowingly devised, participated in, and carried out a scheme to defraud and obtain money by means of materially false and fraudulent pretenses and representations (the "scheme"), which scheme is described more fully below.*

2

3. *The essence of the scheme was to obtain money, through materially false promises and representations, from foreign students who were accepted into graduate programs at UWM and then to use a portion of that money for personal purposes.*

*The Scheme to Defraud*

4. *As part of the scheme, Liu promised foreign students that they would be part of a program run by UWIEF and WIE that would pay expenses associated with their studies at UWM, including tuition and other costs. In reality, there was no such program affiliated with UWM and UWM waived the students' tuition because they were research assistants ("RAs").*

5. *As further part of the scheme, Liu emailed letters to students in which he made false representations about the program. Liu wrote those letters using a fictitious name he invented and using what appeared to be a UWM logo.*

6. *Based on Liu's false representations, the foreign students and visiting scholars wired funds to the UWIEF and WIE bank accounts and mailed checks payable to UWIEF and WIE, which Liu deposited into the UWIEF and WIE bank accounts. As a result of this scheme, Liu fraudulently obtained, and attempted to obtain, over $1.1 million.*

7. *As further part of the scheme, Liu transferred a portion of the funds fraudulently obtained from the students between and among the UWIEF and WIE accounts and his personal banking and investment accounts.*

8. *As further part of the scheme, Liu attempted to conceal his fraudulent activity by creating a fraudulent Sponsored Research Agreement with UWM using a fictitious entity purportedly based in China.*

9. *Liu did not use the money from the students to pay their tuition and other expenses directly. Instead, Liu used a portion of the money he received from the students for his personal purposes, including to fund his personal investment accounts and to pay personal credit card*

3

expenses. Liu also used a portion of the money to fund the fraudulent agreement between UWM and the fictitious entity, through which he reimbursed UWM for some student RA expenses (such as salary and tuition remission) under the agreement.

<em>Execution of the Scheme</em>

10.     On or about June 22, 2017, in the State and Eastern District of Wisconsin and elsewhere,

**YUE LIU, a/k/a "TROY LIU,"**

for the purpose of executing the scheme described above and attempting to do so, knowingly caused to be transmitted by means of wire communication in interstate commerce a wire transfer of $31,565 for victim X.L. from a Bank of China account to the UWIEF account ending in x3169 at BMO Harris Bank in Wisconsin.

In violation of Title 18, United States Code, Section 1343.

**COUNT TWO**
(Unlawful Financial Transaction)

12.     On or about May 19, 2017, in the State and Eastern District of Wisconsin,

**YUE LIU, a/k/a "TROY LIU,"**

knowingly engaged and attempted to engage in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1343, that is, a check in the amount of $90,000 from the UWIEF account ending in x3169 at BMO Harris Bank in Wisconsin deposited into an account ending in x5723 at US Bank, the transaction occurring in the United States.

In violation of Title 18, United States Code, Section 1957.

4

6. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt.

## PENALTIES

7. The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fines: Count One, 20 years and $250,000; and Count Two, 10 years and $250,000. Each count also carries a mandatory special assessment of $100, and a maximum of 5 years (Count One) and 3 years (Count Two) of supervised release. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 32 of this agreement.

8. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9. The parties understand and agree that in order to sustain the charge of wire fraud as set forth in Count One, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the defendant knowingly devised or participated in a scheme to defraud;

Second, that the defendant did so with the intent to defraud;

Third, that the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and

Fourth, that for the purpose of carrying out the scheme or attempting to do so, the defendant used or caused the use of interstate wire communications to take place in the manner charged in the particular count.

5

10.     The parties understand and agree that in order to sustain the charge of an unlawful financial transaction, as set forth in Count Two, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the defendant engaged or attempted to engage in a monetary transaction;

Second, that the defendant knew the transaction involved criminally derived property;

Third, that the property had a value greater than $10,000;

Fourth, that the property was derived from a specified unlawful activity; and

Fifth, that the transaction occurred in the United States.

## SENTENCING PROVISIONS

11.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

12.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

13.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 5. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

14.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties

6

acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

15.    The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

16.    The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

## Base Offense Level

17.    The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 7 under Sentencing Guidelines Manual § 2B1.1 and that the applicable base offense level for the offense charged in Count Two is the offense level for the underlying offense under Sentencing Guidelines Manual § 2S1.1(a)(1).

## Specific Offense Characteristics

18.    The parties acknowledge and understand that the government will recommend to the sentencing court that a 14-level increase for loss in excess of $550,000 under Sentencing Guidelines Manual § 2B1.1(b)(1)(H) apply to the offense level for the offense charged in Count

7

One. The parties acknowledge and understand that the defendant will not join in this recommendation.

19.     The parties acknowledge and understand that the government will recommend to the sentencing court that a 2-level increase for an offense that involved 10 or more victims under Sentencing Guidelines Manual § 2B1.1(b)(2)(A)(i) apply to the offense level for the offense charged in Count One. The parties acknowledge and understand that the defendant will not join in this recommendation.

20.     The parties agree to recommend to the sentencing court that the following enhancements apply to the offense level for the offense charged in Count One: a 2-level increase for an offense that involved a misrepresentation that the defendant was acting on behalf of an educational organization or a government agency under § 2B1.1(b)(9)(A); and a 2-level increase for an offense that involved sophisticated means and that the defendant intentionally engaged in or caused the conduct constituting sophisticated means under § 2B1.1(b)(10).

21.     The parties agree to recommend to the sentencing court that a 1-level increase for a conviction under 18 U.S.C. § 1957 under § 2S1.1(b)(2)(A) is applicable to the offense level for the offense charged in Count Two.

**Acceptance of Responsibility**

22.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. The defendant acknowledges, understands, and agrees that conduct consistent with the acceptance of responsibility includes but is not limited to the defendant's voluntary identification and disclosure to the government of any and all actual or potential victims of the offenses prior to sentencing. In addition, if the court

8

determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

23. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

24. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

25. The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

26. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

27. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

9

## FINANCIAL MATTERS

28.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

29.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

### Fine

30.     The parties agree to recommend to the sentencing court that no fine be imposed against the defendant.

### Special Assessment

31.     The defendant agrees to pay the special assessment in the amount of $100 for each count of conviction prior to or at the time of sentencing.

10

## Restitution

32.      The defendant agrees to pay restitution as ordered by the court to the victims identified in the discovery materials (names and addresses to be provided to the United States Probation Office). The defendant understands that because restitution for the offenses is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## Forfeiture

33.      The defendant agrees that all properties listed in the information constitute the proceeds of the offenses to which he is pleading guilty or were used to facilitate such offenses. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement. The parties agree that the forfeiture of the defendant's properties as described in the information will be determined by the court prior to or at the time of sentencing.

34.      The U.S. Attorney's Office agrees to make a non-binding recommendation to the Money Laundering and Asset Recovery Section (MLARS) of the Department of Justice that any monies obtained from the defendant through forfeiture be applied to any restitution ordered by the Court and distributed to the victims of the offense in accordance with any restitution order entered in this case. The defendant understands the decision to apply forfeited funds in this way is in the sole discretion of MLARS and that MLARS has not made any promises about whether it will grant this request. The defendant understands that if this request is denied, the defendant will be liable

11

to pay restitution and forfeit property pursuant to this Plea Agreement. The defendant understands that forfeiture and restitution are separate obligations and that the Court does not have the authority to offset them against each other.

## **DEFENDANT'S WAIVER OF RIGHTS**

35.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.    If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d.    At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

    e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

12

36.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

37.     The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

38.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

39.     Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the

13

conduct to which the defendant has admitted does not fall within the scope of the statutes or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

## Further Civil or Administrative Action

40.      The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## MISCELLANEOUS MATTERS

41.      The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offenses to which defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, and the defendant understands that no one, including the defendant's attorney or the sentencing court, can predict to a certainty the effect of the defendant's conviction on the defendant's immigration status. The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences, including the potential for automatic removal from the United States.

14

## GENERAL MATTERS

42.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

43.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

44.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

45.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### Further Action by Internal Revenue Service

46.     Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the information.

47.     The defendant agrees to transmit his original records, or copies thereof, to the Examination Division of the Internal Revenue Service so that the Examination Division of the Internal Revenue Service can complete its civil audit of the defendant. The defendant agrees to provide any additional books and records of his and of the entities UW International Education

15

Foundation LLC and Wisconsin International Education LLC, which may be helpful to the Examination Division of the Internal Revenue Service to complete its civil audit of defendant.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

48.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

49.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

16

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: _____2/10/2022_____

YUE LIU
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: _2/10/2022_

PETER ZEIDENBERG
Attorney for Defendant

For the United States of America:

Date: _2/11/22_

RICHARD G. FROHLING
United States Attorney

Date: _2/11/22_

JOHN P. SCULLY
Assistant United States Attorney

17

## Attachment A

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

Yue Liu, also known as Troy Liu, is a Professor in the Department of Civil and Environmental Engineering at the University of Wisconsin, Milwaukee ("UWM"), where he began as an Assistant Professor in 2009. He is a Chinese citizen and legal permanent resident of the United States. From 2016 through 2020, Liu engaged in a scheme to defraud graduate students from China, who paid fees to an entity Liu controlled to be part of what he called a Preferable Education Program ("PEP"). Liu received approximately $1.1 million, through an entity he controlled, from over twenty Chinese students who were accepted and enrolled as graduate students and worked as research assistants ("RAs") at UWM.

Liu made misrepresentations about student expenses the PEP would pay, such as tuition, when in fact UWM waived tuition for students who held RA positions. Instead, Liu kept a portion of the funds for himself, moving money through multiple accounts and engaging in unlawful monetary transactions. He also attempted to conceal the fraud scheme by transferring a portion of the funds received to UWM pursuant to a fake research agreement, which served as a funding source for RA positions through which Liu could reimburse UWM for some student expenses (such as salary and tuition remission).

### Entity and Accounts Established by Liu

In April 2016, Liu started receiving students' payments. According to records from the Wisconsin Department of Financial Institutions ("WDFI"), on April 7, 2016, Liu changed the name of an entity he had previously established, Huixin Investment LLC ("Huixin"), to UW International Education Foundation LLC ("UWIEF"). Liu listed UWIEF's address as a P.O. Box in Milwaukee that he later admitted he controlled. On November 17, 2017, Liu changed the entity's name again, to Wisconsin International Education LLC ("WIE"), with its principal office at Liu's current residence in Mequon.

The payments from the Chinese students were deposited into two accounts established by Liu. On April 11, 2016, Liu opened a business checking account ending in x3169 at BMO Harris Bank in the name of UW International Foundation LLC. On November 17, 2017, Liu changed the name on account x3169 to WIE. Since its opening, Liu has been the sole signer on the account.[1]

---

[1] The business manager of the BMO Harris branch spoke with Liu in the fall of 2017, after BMO Harris noticed wire transfers to the account from overseas and then funds leaving the account within a matter of days. Liu told the business manager that he was paying expenses for foreign students who attended area universities and thereafter moved funds for his own investment. Liu falsely stated that the students attended various local universities, whereas Liu only received payment from UWM students.

On May 13, 2013, Liu opened an account ending in x6573 at US Bank in the name of Huixin with its address at Liu's prior residence in Mequon. On December 1, 2017, LIU changed the name on account x6573 to WIE dba Wisconsin International Education Foundation, with its address at Liu's current residence in Mequon. Since its opening, LIU has been the sole signor on the account.

When agents interviewed Liu, he admitted he was the owner of UWIEF and WIE, which he said was a business he started around 2015. Liu described it as his "consulting" business, through which he could recruit Chinese graduate students based on his connection to China and his understanding of its culture. Liu admitted that UWM did not know he was profiting off the students, but said "that's the difference between China and the U.S. . . . You don't know the culture of China. That's the reason why this business exists."

Letters Liu Sent to Students

Liu sent letters to students misrepresenting the UWIEF and WIE program. For instance, on May 31, 2017, one prospective student received an email signed "Ian Wyatt," from a UWM email account, notifying him that WIE had approved his eligibility for the PEP. During his interview, Liu admitted that he created and used that email account, and that "Ian Wyatt" was a name he made up because, he said, Chinese students would not trust it if a Chinese name was listed.

Attached to the email was a letter signed by Ian Wyatt on what appeared to be UWM letterhead. The letter stated that WIE had approved the student's eligibility for the "Preferable Education Program for admission to UWM in 2017 fall." The comments to the PDF file list Liu as the author of comments and edits made to the file. The letter also included as the return address the P.O. Box in Milwaukee that Liu controlled. During his interview, after initially claiming otherwise, Liu admitted that in 2016 and 2017, he sent out information to students about the PEP. Liu also admitted that UWM did not know he was using its name to promote this program or was profiting from the students. UWM confirmed that it did not offer the PEP or anything like it, was not affiliated with the entity UWIEF or WIE, and did not employ anyone named Ian Wyatt.

According to the letter, the cost of the program was $35,540 but included a "graduate assistantship stipend" of $12,540, so that the "actual cost for study" was $23,000 per year. According to the letter, the benefits of the program included "tuition savings" of $3,000 per year. In fact, UWM waived tuition for those who held RA positions.

Deposits from the Chinese Students

In all, checks and wire transfers from UWM graduate students who worked under Liu, visiting scholars invited by Liu, and a research intern (who was Liu's family member) were deposited into the UWIEF and WIE accounts in the amount of $1,199,682.05.[2] Instructions for the wire transfers listed the purpose as, for example, "graduate tuition," "studying fee UWM,"

---

[2] Liu's entity received $21,036 from visiting scholars, who Liu had also convinced to pay. Liu sent letters to some of the visiting scholars falsely instructing them that they were required to pay an "administrative fee" to the university for their visit. Liu's entity also received two payments, totaling approximately $89,640, from his family member who worked at UWM as a research intern.

19

"campus ID," or "UWM Tuition." The memo line on some checks listed a student ID number and name, and included, for example, "tuition," and "2018-2019 program fee." When agents interviewed Liu and showed him a spreadsheet of the payments, Liu confirmed that the almost $1.2 million in payments were what he called "consulting fees" for his UWIEF/WIE business and that he made approximately $650,000 in profit from the business.

Agents interviewed some of the students. Student 1 met Liu in China at Shanghai University. Student 1 paid Liu for a "program" that he remembered being named WIE and met with Liu in his office to discuss the program and its cost. Student 1 received an email with UWM letterhead detailing how to remit payment to WIE, which Student 1 believed to be affiliated with UWM. Student 1's family provided the money for payments to accounts controlled by Liu. The first was a wire transfer on June 22, 2017 in the amount of $31,565 from a Bank of China account to the UWIEF account ending in x33169 at BMO Harris Bank in Wisconsin (which comprises Count One). The second was a wire transfer in the amount of $29,558 in August 2018. Student 1's parents borrowed money from relatives to fund part of the first payment. Student 1 believed that the payments were for tuition.

Student 2 met Liu in China at Shanghai University, where Liu gave a presentation to students about studying at UWM. Liu instructed students to apply to UWM and told them the cost of the program was approximately $30,000, which included tuition, insurance, and a stipend for living expenses. Liu emailed Student 2 a document describing the program and the cost, and Student 2's family made a wire transfer in April 2016 in the amount of $31,568. At Liu's direction, in April 2017 Student 2 mailed a $31,540 check payable to UWIEF to the P.O. Box that Liu controlled. Student 2 also wrote a $15,770 check payable to WIE in May 2018. Prior to the payment in 2018, Student 2 met with Liu in his office, where Liu explained that the department had limited resources and needed additional funds for increased health insurance costs.

While at UWM, Student 2 learned that RAs did not pay tuition and met other PhD students who had never paid the program fee. Student 2 then questioned Liu on the need for the payments, and though he does not specifically recall Liu's response, he said Liu was convincing during the discussion about the payments. Student 2 said he was shocked when he learned that the funds paid to the program were not used for educational expenses.

Student 3 came to UWM in June 2016 from Shanghai, and made three payments for tuition, one for $33,568 in April 2016, another for $33,540 in April 2017, and a third for $15,770 in May 2018. Student 3's parents provided the money for the payments to UWIEF, which Student 3 believed was UWM. Liu required the payments be made to his entity because he could get a deal or discount on tuition to UWM. Prior to the payment in 2018, Liu approached him in an "odd way," asking him to come into his office, closing the door, and telling Student 3 that he needed to pay for another round of tuition. Student 3 said this was confusing because he knew by then that RAs at UWM had their tuition waived.

Emails recovered from accounts used by Liu included additional letters from Ian Wyatt, on what appeared to be a UWM logo, concerning these students' involvement in the program and stating that the program's "annual payment" was an amount over $30,000, which included "tuition remission." The letters directed the students to either wire the money to the UWIEF and WIE accounts or mail a check to the P.O. Box Liu controlled.

June 2016 Sponsored Research Agreement

Liu entered into a June 2016 Sponsored Research Agreement between UWM and a fictitious company purportedly based in Beijing, China. During his interview with agents, Liu stated that this agreement was not real. The agreement listed Liu as the project director and listed Liu's mother's name as the company's Vice President. Liu's mother signed the agreement on April 18, 2016, on behalf of the fictitious company. Liu admitted that he used his mother's name on the agreement because it would not make sense to use his name. Liu also admitted that he established an email account in his mother's name that he used to communicate with UWM on behalf of the fictitious company regarding the agreement. Records show that the email address had the same recovery telephone number as, and was accessed using the same IP address as, Liu's personal email account.

Under the agreement, the fictitious company was to provide $1,562,564 to UWM through the end date of May 31, 2021, "to design, implement, and test a city-wide traffic work zone project management system for Washington, D.C." The fictitious company has the same name as a real company based in Washington, D.C., with which Liu had worked on a citywide work zone project management system years earlier. A director at the company in Washington, D.C., stated that it does not have any current contract with Liu or UWM and is not involved with the agreement. Liu later admitted that he "100% made up" the tasks listed in the agreement.

Liu admitted that his idea for the "consulting" business came first, prior to the idea for the agreement, which was a way to legitimize receiving payments from the Chinese students. A grant with the university, he said, "looks like more formal" to the students. He stated that he simply made up the budget number and chose a "pretty big number," as he did not know how many students would be coming over. Liu called the agreement a "shell grant." When asked why he created this grant with UWM, he stated that he thought it could be convenient for students and could help them and also make some money for him at the same time.

Liu essentially used this agreement to serve as a funding source for the RA positions. When a legitimate company entered into a grant or agreement with UWM to fund research, the company would reimburse UWM for related expenses, such as salary, fringe benefits, and tuition remission for RAs, as well as UWM's finance and administration charges. Under Liu's fake agreement, the fictitious company was to reimburse UWM for expenses under the agreement related to the RAs.

Invoices under the agreement were to be issued to the fictitious company at the P.O. Box in Milwaukee controlled by Liu. Payments to UWM under the agreement, however, were made instead by WIE, another entity Liu established, and Liu's mother. When interviewed, Liu admitted that he made all those payments, including by using his mother's account. Those payments under the agreement with UWM totaled approximately $319,716.93 and were to pay invoices from UWM for expenses such as salary, fringe benefits, tuition remission, and UWM's finance and administration charges. WIE also made payments to UWM in the form of a $165,000 gift and $17,934.91 for a different grant with UWM.

<u>Liu's Use of the Funds</u>

Liu used the money for personal purposes, sending over $400,000 to his investment accounts at various companies and approximately $100,000 to pay credit card expenses. During his interview, he admitted using some of the money to pay personal credit card expenses and transferring some to his investment accounts. Liu engaged in many transactions to move money from the UWIEF or WIE account to his personal bank account and to his investment accounts. As one example of such conduct, Liu deposited a check in the amount of $90,000 from the UWIEF account into his personal bank account ending in x5723 at US Bank on May 19, 2017. The property involved in this transaction was derived from the wire fraud scheme. At one point during his interview with agents, Liu stated the purpose of the fake grant was not for money laundering, even though the agents had not mentioned money laundering.